Case No. 17-5203. DCH Regional Medical Center appellant v. Alex Michael Azar, II, in his official capacity as Secretary of Health and Human Services. Mr. Rue, the appellant, is right for the accolade. Good morning, Your Honors. Jeffrey Rue from Foley and Lardner on behalf of Appellant DCH Regional Medical Center. May it please the Court. This is an important case, Your Honors, because at the heart of this case is the ability of a party injured by an act of the executive branch of government to come to a federal court and seek redress. There is a strong presumption that can only be rebutted by clear and convincing evidence to the contrary that agency action is reviewable in court. Even in the face of a statutory preclusion to review, certain claims can still go forward. Before we get started, I want to ask you a basic question about how this whole system works. There are these upfront prospective payments that are made. And then after the fact, once all the data is in, maybe a few years later, there is a reconciliation process. That's correct, Your Honor. And in that reconciliation process, would you be able to straighten the problem out here? I don't know if you've already been through it, but would the reconciliation process be the place where you would go, actually, you had our numbers wrong. You should have counted these beds from the, what I'll call the Mergie Hospital. I don't think so, Your Honor. And I think that the reconciliation process is – at least appears to be designed to account for those hospitals that the secretary did not believe would qualify for DISH at all, and that ended up ultimately qualifying, and those that it believed would qualify for DISH, but in the end, they didn't, and therefore they recouped those amounts. Excuse me, please. The government points out that if you were to prevail, there would have to be a readjustment so that the cost would have to be recovered from other hospitals. And we disagree with that, Your Honor. The reconciliation – And that's sort of a fact that's on there. I'm sure the public knows that. You've got to explain why the government thinks the government is wrong. The whole reconciliation process itself, it does that. It estimates the amount of uncompensated care for hospitals that it didn't originally, but it doesn't change the denominator, which is for all hospitals. So a new hospital can come in that wasn't part of the denominator estimate, which is the total amount of uncompensated care, and they say we're not going to change that denominator. And that's what would impact – there's not a set amount of dollars that said this is it. Well, if it doesn't change the denominator, then it has to change the numbers, right? So that means that some hospitals are going to pay more and other hospitals are going to pay less. Your hospital would pay less if we reduced it, right? It's not what the hospital is paying. It's what they're getting reimbursed. Oh, excuse me. They have to pay – if we reduce it, your hospital will get more. That's correct. Where would that money come from? From the government. I don't think there's a set pool that it would take away – it wouldn't take away from any other hospitals. Why would that not change? That's the – The government said that's what would happen. It would take it away from other hospitals. I don't think that's how it's set up in the federal rule. They're not going to retroactively come and change that from the hospitals. I don't think that's what the federal rule reflects. So this part of Medicare does not have a budget neutrality requirement? I don't believe so, Your Honor. I don't believe that's the requirement here. Well, when they do the prospective payments, are they doing 100 percent of the appropriated funds for that year? Or are they doing – because it's prospective and they know they're going to have this reconciliation process later, do they do some lower percentage and then it all gets cleaned up later when the final data is in? I think they're doing the calculation and they're paying what they think will be due, and it's – They've got to leave some margin to cover up this reconciliation process. I mean, they do this every year. I'm not sure of the dynamics specifically of how they make it work. You're not sure whether or not – if you're reasonable enough to get one, you're not sure whether that's going to happen? I do not believe it's taken away from other hospitals. You don't know? I don't know for sure, but that's how I read the federal rule. I think it's fairly clear there that they're not going to change that phenomenon and impact it from other hospitals. I think there are two independent grounds here, as I was saying, for the claims in this case to go forward. Why aren't you precluding from the Florida case? The Florida case, Your Honor, is I think read overly expansively in this case. The Florida case did not overrule Bowen v. Michigan Academy. It did not overrule McNary. No, we don't generally overrule. That's right, Your Honor, and so – Well, it's a Monday today. What the Supreme Court said in those cases is that collateral challenges to an unreviewable – And what it said in McNary, essentially Florida Health Sciences didn't deal with the general rule.  What we're challenging – We're not, Your Honor. We are challenging a rule that governed how the data was chosen, not the actual choice of data. And that may be a fine distinction, but it's an important one in this context. Sorry, you're going to have to say that slower. You're challenging a rule about how the data was chosen, not the data that was chosen. That's correct, and it's a rule that was set up that prevented – Tye CMS has hinted that you can't look at data from more than one provider number in any case. You cannot do that. In any case? It was – It was an application in this case. It was in the Federal Register. It was in the Federal Register that said this is how it's going to be done. Was it done by rulemaking? There was a notice and comment period. We submitted a comment, and it was effectively ignored. So it's a federal rule? Yes. And that is the rule that we're challenging. And in that way, this case fits comfortably with Bowen and McNary. The fact that that might ultimately affect the choice of data and it might ultimately affect the estimate is no different. In the Michigan Academy case, CMS in that case was talking – putting physicians into three separate categories. And depending on which category they were put in, that determined the amount of the reimbursement for Medicare Part B services. And the dispute in that case was saying the family physicians who were board-certified were put in one group, and those who weren't were put in another. And the challenger said this doesn't make any sense. This is irrational to judge between them. And they challenged the method by creating these categories and assigning people to them. And the court said even though that was going to guarantee to change the amount of reimbursement, that they could make that challenge. And that reimbursement amount, the amount of benefits, was unreviewable in court. McNary is a case in which the court concluded the problem with the deportation and deportation was the reporter didn't understand Spanish. There was a number of issues challenged in McNary about the process. That was the constitutional problem, that it was a stripping problem to the issue of immigration. It was collateral to the ultimate determination, but it had a causal relationship with that determination. And I think that's where Florida Health Sciences, at least as applied by the government, goes too far. A causal connection is not all that matters, because if it did, then number one, McNary and Bowen really have no place anymore. And number two, there's nothing that the secretary could do in this context that could go challenged. It would be a complete check, completely unchecked. McNary allowed a class action through 1331, prospective class-wide, to challenge procedure brought by a group of plaintiffs, some of whom had never had their status adjudicated. It's much more attenuated than here, where you're a single hospital, you're after the fact, you've been denied the compensation that you want, and the relief that you seek is to vacate the secretary's factor three calculation. That's exactly what the statute says you can't do. And for at least 17 of the plaintiffs in McNary, that's exactly what they did. They vacated the final determination as to their immigration status. But a lot of the plaintiffs didn't have that status determination adjudicated. And the court didn't distinguish between those and said, you plaintiffs over here that are doing that, you're out with these other ones. That's right, which makes McNary general and prospective in a way that this case is not. I think it's the nature of the rule that's being challenged. It's the individualized determination versus – So the case they did is different than what was done by an adjudication, an informal adjudication rather than a rule? Perhaps, Your Honor. I don't know the answer to that. Well, that's an important question. In other words, the government agency simply said the data we will use for your hospital will not include the marriage of the hospital. Which you could have done. Right. Would the case be different? Yes, it would. Yes, it was. It's a general rule that applies to everybody, and that's why we're – and that's the difference here. It's not the unique – Is there anybody else that it applies to? There are other hospitals, I believe, in the same boat as we are. We're not here with those hospitals today, but this rule was irrational in every circumstance. In Florida Health Sciences, it's individualized. It's not, though, because you could just as easily – the challenger in Florida Health Sciences could just as easily say, I'm not challenging the selection of data just as the decision. I'm challenging a rule to use – I think it's March 2013 as the cutoff rather than April 2013. So, two things, Your Honor. I think, number one, they didn't do that. Their focus was on the choice of data. They came up and said, it says appropriate data. You didn't choose appropriate data for us. But, two, I think – On a theory that could be articulated as a rule. And I think that's where – so when the court – this court talks about McNary in that context, that exact context, and say, recasting this as a challenge to perhaps that type of general rule doesn't work here because of this exception to when you're just challenging – you're solely trying to change the determination for you. And, again, that case was very individualized. That choice or that rule, as applied to Florida Health Sciences, arguably didn't make sense. Our rule doesn't make sense any time. All right. And I want to make sure I understand you correctly. You say that if the government had done this to your client in an informal adjudication, simply said, the estimate is X because we're excluding the data from the moot. You would say you have no case? Our case would not be on these grounds, certainly. I don't think – Would you say that that would be perfectly legal? I think that in that setting, is there an argument that can be constructed that it would be – I mean, I think there are some claims here, including the ultra-virus doctrine that I want to talk about. I'm not sure that there's another clear route here. McNary gives us a clear route in the face of a statute like we have in these books. I don't – Your whole case depends on the choice the agency used to use rulemaking as opposed to an adjudication. It certainly is an important distinction. You said that one thing that happens in the reconciliation process is they look back and they go, somebody was included that shouldn't have been included or someone was excluded that shouldn't have been excluded. If someone tried to bring a challenge early on and says, hey, you included the wrong hospitals or you should have excluded those hospitals and you're mucking up the numbers, that inclusion and exclusion decision, is that something that's barred by – a challenge to that? Barred by Florida Health? I don't think so. I think it's in a separate context, Your Honor. That determination is after cost reports have been adjudicated and we – it's an empirically justified – No, but just up front in their federal register that they do with how their prospective payments are going to be calculated, it looks like they're not including a certain group of hospitals as dish hospitals that should be included in the counting. This is up front, not in the – you said this happens in reconciliation. I'm saying up front we can tell from their federal register notice they're going to miss a bunch of hospitals that should be in or they're going to include a bunch of hospitals that should have been out. I don't think Florida Health Sciences speaks to that one way or the other. I don't think it's dealing with – What's your position? I just don't think that's dealing with the estimate that the Secretary is making. The Secretary is not – the way it's set up is that they just – they're just not in that process yet. If I could speak quickly about the – And so if they're miscounting hospitals for that aggregate, right, that's the bottom half. That's right. The fraction, that's – I don't see how that's not part of the very estimates and calculations that we're talking about here. That's a fair point, Your Honor. I'm not sure that – I'm not sure if a hospital could challenge – I see what you're getting at. Could a hospital challenge that up front or do they have to wait until the reconciliation process? Your fraction is going to be all wrong. I think that they probably would be precluded up front from making that type of challenge. Then why isn't your – because you're also arguing about who should be counted and who shouldn't. Well, we're talking about – Is it a numerator-denominator thing? But what we're focused on is not the fact – not what they did here but how they did it. It's the general rule that's being challenged. And I think that if there was a similar general rule that governed how they made the denominator estimate that was irrational, then that could be challenged here. But that's – I don't know what that rule would be. But here we have that. And I think that's what gets us in under McNary and Bowen. I also think that's what gets us in under the – Every year they do a federal registry notice that goes in a lot of detail about how the prospective payment system is going to work for whichever X year it is that they're doing it for, don't they? They do issue a rule that gives you – Is everything in that federal register notice challengeable because it's in that rule? If there are rules that are set out there and there are rules that govern the method to do something – I'm just asking you, is it – I don't want you – I'm asking what you mean by a rule. Do you mean a rule as in it's in the federal register, it goes through notice and comment, and so it's everything they lay out in that federal – annual federal registry? I think that's where we see the rule here. I don't know if, for example, in McNary, I don't think that – Well, in Florida Health, was the calendar problem flagged in the federal registry notice that year? I think it was discussed in the federal registry yesterday. So it was part of the rule. What's that? Was it a formal rule? I believe that the decision to use March was a formal rule. Yes. Yes. It was a form to accept notice and comment by March 3rd. Right. Right. And again, I think the distinction between those cases – and this is what's brought out in the case law – is that when you're looking at an individualized application of something, that only applied to them. And here, this is – If you guys were the only merger that happened in – I forget, are we talking – you came from here for 2014. So if you were the only merger affected – I don't think it would matter because this rule applied to everybody, and it didn't make sense at any time. The fact that it didn't impact other hospitals who didn't undergo a merger, that doesn't change the fact that this is – this is not just an individualized challenge. Our argument doesn't only work because of our situation. It makes – the rule makes no sense in any situation. I mean, there's a lot of numbers in this process. Yes, there is. But the fraction that they adopt doesn't just apply to any one individual. They apply a consistent fraction. Do they not to everybody for that year? Well, each – Here's how we're going to compute their fraction. Each hospital has its own estimate of the share, and then they're going to pay. So I would write a denominator is the one that's the percent of all uncompensated care. That's going to affect everybody. That's correct. And so can any computation that goes into that number be challenged because it's going to affect everybody and it's in a rule? I think if – so the estimate of that amount, of the denominator amount, cannot be directly challenged. If there is a general rule that led to that determination, then under McNary and Bowen, it could be challenged. So what counts as a general rule? I'm trying to get clear from you because you've got the Federal Notice in Common, and it results in a – I think certainly something that comes through Notice in Common qualifies. I think in McNary we have an example of the things that were the policies and procedures that were challenged there. Those type of rules, that's not a rulemaking. So perhaps it's a bit broader than that, but certainly we fit into either category, whether it's a broader or narrower reading of that. So what's left of preclusion under your theory? I mean, every year there's this regulation which has all sorts of design decisions which are complicated, challengeable, reasonable people can disagree. How do you account for mergers? On and on and on. And they design the formula and then they make the computations. It seems to me you're saying what Congress barred review on is only a computational error. So a couple of things, Your Honor. First off, I just want to point out in Bowen they distinguish between the method by which Part B awards are computed as opposed to the computation itself. So fine distinctions matter here. In this case, individualized determinations where we're not fighting about the process but really just the result, those things, all the time in this space there's fights about, well, the number of days that were counted was inappropriate and the things on my worksheet submitted with our cost report. These types of audit questions are typical in the PRB space and these kind of things. These are the type of claims that would not be precluded or that would be precluded. If it's a rule about data collection, then it can be challenged. That's your position. Say that again, Your Honor. If it's a rule about how the data is collected, that can be challenged. Yes. If it's a general rule about how this would be collected, that would be challenged. And I think Bowen talks about it. What would be a non-general rule about how data is collected? In sort of Judge Silverman's example, if they said, well, let's just talk about you personally and for your individual reasons we're not going to include your data. That would not be a rule. That's right, and in that case you couldn't. I don't know that there is a general rule that would apply to all that under Bowen and McNary could not be challenged on this basis. It's not precluded. The determination, the estimate here cannot be. It's even if the rule applies only one time. I think that's correct. That's right. I'm sorry, Your Honor. Well, I think the Court recognizes this and I think this is the exception. The Supreme Court said in Bowen, unlike the determination of the amount of benefits, the method by which such amounts are determined ordinarily affects vast sums of money and thus differs qualitatively from the quite minor matters, review of which Congress confined to hearings by the carriers. In addition, permitting review only of a particular statutory or administrative standard would not result in a costly flood of litigation because the validity of a standard can be readily established at times even in a single case. And I think that's what it's talking about. In a general rule that applies to everybody, that's not going to cause thousands of cases. You're challenging a general rule about data collection, not the data itself. That's right. But you're not challenging their overall methodology. It's just data rules. It's a part of their methodology. It's a rule that governed how they collected the data. And that rule, I think it— Absolutely. Just as the rule in Bowen resulted in an incorrect amount of reimbursement, just as the rule in McNary resulted in an incorrect decision on the immigration status. We're in the exact same boat as those. You do have a terrible problem in Florida. These are— I don't think Florida has been directly challenged. I think there is a tension between Bowen and McNary and Florida Health Sciences if Florida Health Sciences are read too expansively. And I don't think it needs to be. And we've submitted that in our brief. I think they can be read together in harmony. The selection of data at issue in Florida was part of the rule in that case. This got cites to the Federal Register. Part of the design of that formula was this March 2013 cutoff. HHS picked the March 2013 updates as the most recent data it would use, citation to the Federal Register. In Florida Health Sciences, yes. And in the court's decision, when it's talking about that, that's where it references McNary. Instead, this argument could potentially work under McNary, but here it doesn't because the McNary rule doesn't apply when you're solely trying to just change your individual determination. But, again, that is really talking about the fact when this is just unique to you. The idea that the decision of March 2013 was chosen is a problem. It's only a problem for Tampa General and Florida Health Sciences. How is the Florida challenge any more unique than the challenge here? Because the challenge here is to a general rule that's applicable to everyone that makes no sense in any circumstance. The challenge there was to a general rule. It's a hospital. But the only problem with that general rule in that case was its unique application to Florida Health Sciences. And in other situations, they would say, well, the rule makes perfect sense. And I think that's the biggest part also for the ultra-virus doctrine. There's a huge distinction between this case in Florida Health Sciences as to whether this rule in place had any rationality. It makes absolutely no sense. There's never a circumstance where it would have made sense to exclude this data. In Florida Health Sciences, there's lots of reasons why choosing March 2013 as a uniform cutoff could make sense. They gave an explanation for why they were counting it the way they did for this 2014 computation. They said this is how we count mergers under other numbers as well. And you may disagree with it, but is there anything in the statute you can point to that says they were required in the exercise of their authority to count merged hospitals the way you want to? Yes, Your Honor. Where was that? The statute says they must use appropriate data, and it is beyond obvious that they didn't in this case. It's not in Florida Health Sciences. Where are these data? Is there a correlation? No, that they had a patent violation. Because it's inappropriate. It was inappropriate data. It's a matter of law. Yes, you can look at what they did. And there is no way to – and their justification that you mentioned, Judge Miller, is not a justification. To say, well, we maybe do the same irrational thing elsewhere, which we disagree with. But that's not a justification. That doesn't explain why it makes sense to do that here. It doesn't. They've never tried to make that explanation on the merits because they can't. And I think it's obvious. When you're looking at data from a merged entity and you say, I'm going to make an estimate for this entity, but I'm going to use data in the past. Let's be clear. Appropriate data is all you've got. You don't have another statutory provision. That's correct. That's correct. That is the mandate, and it's unambiguous. And here I think it's obvious that it wasn't meant to be. Sorry. We've said that in order to trigger ultra-virus review, the error has to be so obvious and so substantial that it looks jurisdictional or close. And the kind of error you're alleging here, selection of the wrong – well, it's not selection of data, but how you account for a merger in the weeds of this calculation. You've got a pretty good policy argument, maybe a pretty good arbitrary and capricious argument, but it doesn't feel like that's something approaching a jurisdictional defect. I think, Your Honor, that there are some cases, certainly, that talk about it in terms of jurisdictional defect and merging those two things. This idea of a patent violation, obvious violation, I think we step back and get out of the Medicare morass for a second and just look at the simple proposition. An entity in 2014 that's merged. We're going to estimate something about them, and we're going to try to predict something about them in that year, but we're going to do that based on data before they merge. It's not a nuanced proposition to say you must look at data from both of the parties to that merger. That's obvious, and that's why they can't dispute it on the merits. And I think this is a case where the ultra-virus doctrine should come into play if we're not ultimately brought in through McNary and Boehm. Do you have any—what's your best case applying the doctrine in circumstances where it looks like a very clear abuse of discretion, but nonetheless nothing worse than that? We cited some authorities in our brief, the Comstead and Southwest cases that are there. I think that the court has talked about this doctrine in some recent decisions, including as it thinks about Florida Health Sciences. And one of the things it has said is this is what protects against allowing for sort of absurd results. And again, as we submit in our brief, the rule at play here, the causal relationship towards the estimate that it has, would be no different if the rule was, well, you can't look at data from male patients. It's the same sort of relationship, and we think it's just as obviously wrong. Thank you. Good morning. Abby Wright on behalf of the Secretary. I'd like to begin with the question of the rulemaking. So CMS is required by statute every year to do an annual rulemaking by notice and comment rulemaking. So in Florida Health Sciences, just as plaintiffs do here, plaintiffs there try to say we're challenging a general methodology, and we see that in the rule. It applies to everybody. So it's not precluded by the judicial review bar. And plaintiffs, I think, here are trying to draw that exact same distinction that this court rejected in the Florida Health Sciences case. This court also rejected the attempt of plaintiffs there to construe it as a procedural challenge rather than a challenge to CMS's substantive determination. I'll also just address that reconciliation. I was just going to address your reconciliation question. So the reconciliation is a limited on-off switch that occurs once a cost year is settled. So the Secretary makes uncompensated care payments looking forward for that year, and those are estimates, and that amount never changes. So all that's done three or four years later is to say there are some hospitals who appeared as if they would qualify who didn't. You have to be qualified for the empirically justified dish payment in order to keep your uncompensated care payments. CMS, so at the large- It's just qualifications. It couldn't be, oh, my gosh, you misreported 200 patients or 200 beds, Medicare beds, whatever you call them, and you were overpaid in retrospect. Now we see that that was a misreport. No, there is no mechanism for going back and recalculating anything. It's just under the statute you can't get paid at all if you don't qualify for the empirically justified dish payments. So imagine that you're going to make this rule, and you go, these mergers are really complicated. It's hard for us, first of all, to be able to pin down exactly what dates they happen and when beds are digitized and when there's maybe one had a Medicare number, one didn't. These things are really complicated. So the rule we're going to adopt is that in the year of a merger, we'll count neither hospital. I'm sorry, the boat's left. We'll count neither hospital in the year of a merger. Neither one's beds will be counted. Would that be challenged? So Florida Health Sciences recognized that there could be an ultra-various challenge. Would that be ultra-valid if you counted neither? I don't want to- What we have here- Well, you immediately ran to ultra-virus, so I'm thinking that's- Well, I think that would be problematic to, I think, not make an estimate of uncompensated care for a hospital in that kind of on-off way. Of course, that's not what happened here. We have- Just for the year of the merger, until we figure out status, figure out who's got the Medicare number, who is taking which things, it's just too confusing for that year. It's administratively hard to-I mean, you guys are doing massive amounts. Yes, no, that's right. There is a very big, complicated thing, and oftentimes, administrability, that satisfies a reasonableness test. And so I'm just asking the question whether, if you just counted neither the year of the merger, that's what your Federal Register rules said, that could be challenged, and if so, how? I think you would come closer to a scenario in which the Secretary was not doing what was directed under the statute. Here, what was directed under the statute is that each hospital will get the 75% of their dish payment. That's the new part. It will be based on their estimate of uncompensated care, if they are forecast to get an empirically justified dish payment. And so the Secretary here selected data from the existing certification number as the data source. I think a plaintiff in that hypothetical could maybe make a better argument. So you're agreeing it's ultra-virus to not count a hospital's beds that should be counted? No, no, Your Honor. I'm just agreeing that in that hypothetical, I could imagine that they would have a stronger argument that the Secretary had acted on. But still not successful. I don't want to ask about the merits, the strength of the merits. I'm asking, you've got a procedural bar on judicial review here. So is it barred or not? I guess I would – I don't want to commit to the agency, but we might make a bar argument in that case, Your Honor. This case is nowhere near that case for the reasons I've explained. No, but this helps to understand how you guys read this bar on judicial review. And so just cutting hospitals out because they merged for a year, there's nothing anybody can do about that. There's no challenge. We're not – so in this case, we're not cutting out hospitals because they merged. I'm asking my question about my hypothetical. Your position is that just cutting out hospitals and not counting them just for one year because it's complicated. It would be challenging in estimate. It would plainly be barred by the terms of the statute. I think that would definitely be our position. I've never seen CMS do anything – Would it rise to the level of ultra-virus? I don't want to commit to that, Your Honor. I've never seen anything like that in my years working with CMS. I don't imagine they would ever take that position, and that's not what we have here. So let's talk about this one, which is slightly less extreme but maybe not that much. What is the justification for ignoring all of the pre-merger uncompensated care? So this challenge relates to the fiscal year 2014, which was the first year of the program. So CMS issues its proposed rule. DCH Regional comes in with a comment saying, CMS had proposed to use data from 2010-2011. We merged in the interim. CMS says, I think quite reasonably, we use the data we have associated with the certification number for your hospital. CMS every year makes a 10-million-line spreadsheet that has your number and all of your data. So CMS – and it wasn't without cost to – if CMS had overpaid those hospitals, CMS would be underpaying other hospitals. So CMS, I think, quite reasonably waited until fiscal year 2015 when they had in place a mechanism to determine which hospitals had merged and what it meant to merge, because merger isn't necessarily crystal clear. So CMS was concerned about a scenario, and you can see that in fiscal year 2015, where one hospital bought another hospital but didn't merge the Medicare agreements. So basically one hospital closes, was purchased by the second hospital, and so it may not in that case be justified to use the data from the hospital. Suppose two hospitals merge. Is there any – and the non-surviving hospital has committed any number of legal violations that would trigger consequences vis-à-vis HHS. Is there any conceivable circumstance under which HHS would say, you know what, pre-merger, non-surviving hospital, we're not going to worry about that? Well, if the hospital – the purchasing hospital does not assume responsibility for that Medicare contract from the hospital that it purchased, CMS could only go after the close hospital. I thought it was corporate law 101 that liabilities survive a merger. Well, that was their concern in fiscal year 2015, was that they were – if you didn't – for overpayments, for things like that, they wanted the merged hospital to have responsibility for both its Medicare. I mean, I would make a strong wager that the government would take the position that all of those liabilities survive. Well, I guess I don't know the direct answer to that question. I know what CMS said in the fiscal year 2015 rulemaking was that they were concerned about that to make sure that if it was really two hospitals merging and the days were counted, that the surviving hospital had assumed responsibility for those Medicare – any Medicare overpayments that would be contracted. I'm a little confused about the question I was asking in the follow-up report in terms of concerning the consequences to the agreement as to whether there would be an adjustment, a necessary adjustment, on the amount that you would owe to apply other contracts. So I think the answer is that we – I don't know what CMS would actually do if this court ordered it to pay additional monies to DCH Regional. I know that – we know that it's a – It doesn't come out of your paycheck. It does not come out of my paycheck. But it's a pro rata share. And so what we're concerned about is under DCH Regional's theory of additional review bar, it's hard to imagine what is not – what challenges would not be allowed to go forward. And if we're talking about that cumulative effect, so every time the cost year closes, it's three years out. What do you think about counsel's assessment that if he was to see it by informal adjudication, he would not have a case? Just because you use rulemaking rather than informal? Well, I agree that he would not have a case under individual adjudication. I also don't think he has a case here, Your Honor. Well, what do you think about his statement? Well, I think that's – my opening statement was, I think, to make the point that CMS, actually by statute, has to preclude by – go forward on the basis of a notice and comment rulemaking, is not doing individual adjudications. So I think that that distinction doesn't come up here, and I think in both cases it would be precluded because DCH Regional is trying to challenge the amount of – the estimate of the uncompensated care provided for the year. You had a rule of counting only beds in the main campus of the hospital, but not satellite branches of the hospital. Hospitals will have little smaller branches in more rural areas. And, again, for concerns about extension of the Medicare contract for those satellites or reliability of data for administrative reasons, you said we're not going to count them. Are you asking whether that would be ultra-various? I'm asking whether that would be judicially reviewable. It would plainly be barred by the text of the statute. I think it would also not be – Plainly barred how? It would be a challenge to the amount of their uncompensated care they provide for that year. They would be saying include more days than you've included. And that's exactly Florida Health Sciences. Okay, so you're saying it would be barred. It would be barred, yes. So is there any limit? I mean, you guys can just do anything unless – anything short of ultra-various cannot count? Well, I think that using the term – What if you used a calculator? You used a calculator that was known to drop digits. It's known. It's just, you know, sorry, that's what the government could afford. It's known to drop digits. And they're all pleading with you. Your numbers have been wrong. Every year you've used that for all of us. We're hemorrhaging money here. Please don't use that calculator again. You're going to say I'm resisting hypothetical, but let me make very clear. We're nowhere near that point here. Congress used the phrase appropriate data, I think the district will recognize, to give the Secretary a pretty broad range of discretion here, coupled that with a very broad judicial review bar. And it makes sense in the context of a prospective payment. Does a broad review bar apply to everything you do in getting to these numbers? It's a very broad judicial review bar. What wouldn't it cover? What do you do in getting to the numbers wouldn't it cover? It covers anything that's inextricably intertwined, as this Court said, in Florida Health Sciences, Well, that was with the data itself. It's interesting that this statutory provision, unlike a lot of the surrounding ones, doesn't use the phrase, it bars the estimate, the data, but it does not bar methodology. It does not have that language. And that language is included in other provisions, which means it was probably deliberately excluded from the judicial bar. So why isn't it a challenge to methodology? The Court in Florida Health Sciences addresses that in its decision expressly and says it's not persuaded where methodology and the estimate collapse, that you can pull, you can distinguish methodology. And that's the case here, because every year there is a new rule. When would methodology be distinct from data? It's not there. It wasn't viewed as a methodological argument. What methodological challenge would be allowed? Because you don't have a judicial review bar on methodology here. We don't need it because it bars the estimate, and the estimate is always the product of some, quote, methodology, which is the selection of the data. That's exactly what Florida Health Sciences put. Plaintiffs in Florida Health Sciences came in and said, we have better data, you're using March 2013 data, you know better. So we're going to use everybody's data from 1997 for our 2018 estimate. And that would be barred as well. Yes, that would be barred as well. Would that be ultravirus? No, I don't think so. Because the question for ultravirus review is, is the secretary doing the kind of thing the statute authorizes it to do? That's how this case is different. Aren't you supposed to be a little stingy in how we construe bars to judicial review? And it seems to be boundless under your theory. Florida Health Sciences, the court recognizes, it's not boundless in the sense that the court can't ask, is the secretary making the kind of decision the statute directs the secretary to make? That is a very limited role for the court. That's right, that's the product of Congress's choice, saying appropriate data and a very broad decision. What protection do these hospitals have? Do they just say, they pick up the federal register and notice, they go, that's nuts. They're using the broken calculator again, and they're only using data that is 30 years old and antiquated. And so we're just stopping our Medicare program that day? What protection do they have? They're providing services. They have going to Congress, they have talking to CMS. I think you see exactly what they have here, because after the fiscal year 2014 rule comes out, CMS works with the hospitals and the fiscal year 2015 rulemaking acknowledges that they've improved their estimate, and so they worked with them and they improved the estimate. But if they didn't, the hospitals can go to Congress. CMS wouldn't be so cooperative. I'm just trying to figure out how this actually works. Because it's prospective payment, they could just say, never mind, they can't bound to the Medicare program through their Medicare contracts. I don't want to suggest that it's a realistic option for all of these hospitals, but they can. It's a prospective payment. You don't have to provide Medicare services. They don't have any contractual obligation by virtue of having, because they have to do something to qualify to get a Medicare number. Right. They have a contract. You could decline to provide that care. The other option, of course, is that hospitals, that's right, they don't have to participate in Medicare. Right then and there. And hospitals can go to Congress, and they do go to Congress. I mean, this is an area where you do see legislation and you see changes. And so if there really were a serious problem, I think hospitals could go to Congress and say either get a judicial review bar, make different directions in the statute. Those are their options. What's not an option is to come into court and make an arbitrary and capricious APA-type challenge to the determination of the amount of their estimate. Is this case distinguishable? Put aside Florida Health and Palisades General for a second. Okay. Is this case distinguishable from Parkview? It is, yes. I can't find any distinction other than our later decisions, arguably just blowing this off. I think Parkview is distinguishable, and so is University Health. Okay. So let me just tell you why I think it's not. Okay. Sure. So you have a hospital that is challenging ex post final agency action, denying to that hospital the disputed payment, and then they go into court and they seek review. And we say that the statute says the decision shall be final, and we say, well, but you can challenge general rules. You can't challenge the denial. You can challenge general rules leading to the denial. Right. And the general rules at issue, so far as I can tell, are all baked into some regulation that's discussed in these Federal Register sites. Why isn't that exactly what we have here? Sure. So Parkview is different, I think, and obviously you acknowledge the late cases, but Parkview is different itself because it involves the Medicare Reclassification Geographic Board, which is a separate body that provides that individual adjudication. And what plaintiffs there were challenging, you can see this in Palisades, because this court drew that distinction, are the wage index inputs into that. So this court said those are sort of collateral procedural things you can challenge. You can't challenge the Reclassification Board's decision. So the judicial review bar at issue there focused on the board's decision, which was an individualized adjudication. And in Palisades, we know that's correct because this court in Palisades refused, actually, to force CMS to change the reclassification, even though CMS had changed the wage data. So because of the way that program works, there is a distinction there that just isn't here. It is all about the notice and comment rulemaking, and that the quote methodology is precisely the estimate in this case. If there are no further questions, we ask that the district court be affirmed. Thank you. Did Mr. Breaux have time left? Thank you, Your Honor. Just a couple things to pick up on Judge Katz's point about Parkview. Parkview is still good law, and I don't think it can be distinguished from this case. The change came out through – it originated in Skagit in the Ninth Circuit, and it really is unique to this wage reclassification context. There, there is a very important – they discuss in Skagit McNary. And they say, well, in McNary here, this claim could still go forward. However, the scope of judicial review that's precluded here involves a system where budget neutrality is central. And if there is a change for anybody, everything is screwed up. Therefore, we're not going to allow this type of challenge. And almost every one of these cases deals with that context. But the McNary principle, which applied in Parkview and should apply here, is right on. I think that what we're also confirming here is that the government's view of Florida health sciences is that everything is precluded. Nothing can be challenged. And I don't see how the methodology at place in Bowen and the policies and procedures leading to a final determination in McNary were any less inextricably intertwined than their view of Florida health sciences and how broad that extends. There's a difference. Florida health sciences was an individualized decision. The decision not to use March for them – use April, and that's what they wanted. That's different. We're saying this is a general rule. It applies to everybody, and it doesn't make sense ever. The only way they act is by doing that. That's fair, but the nature of the challenge was – and effectively, an as-applied versus a facial challenge is maybe one way to think about it. They're not saying that it was wrong to have March as a cutoff. There are plenty of reasons why it made sense that. They said it didn't work for us because we have some extra data here that we want to submit. Here we're saying this makes no sense ever. Hard stop. And that's a big difference between these two cases. Thank you very much. Thank you, Your Honor. Stand, please.
judges: Millett, Katsas, Silberman